UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

GEORGE HARRIS,

                                        Plaintiff,

              -v.-

                                                          9:07-CV-1065
THERESA HOWARD, Nurse, Health                             (TJM/GJD)
Care Provider #231, *et al.*,

                                        Defendants.

GEORGE HARRIS
98-A-0475
Plaintiff, *pro se*

ADELE M. TAYLOR-SCOTT, Asst. Attorney General
Attorney for defendants

THOMAS J. McAVOY, Senior United States District Judge

## MEMORANDUM DECISION and ORDER

In this amended civil rights complaint, plaintiff alleges a denial of proper medical care as well

as a variety of other constitutional, federal law, and state law violations resulting from plaintiff's

attempts at complaining about his medical care. Amended Complaint (AC). (Dkt. No. 38).  Plaintiff

names sixteen defendants in his amended complaint. AC ¶ 5(A)-(P).  Plaintiff seeks declaratory and

substantial monetary relief. AC ¶ 97(a)-(d).

Presently before the court are two motions filed by defendants and two motions filed by

plaintiff.[1] (Dkt. Nos. 52, 53, 61, 76).  Both of defendants' motions are for judgment on the pleadings[2]

pursuant to FED. R. CIV. P. 12(c). (Dkt. Nos. 52, 76).  In response to defendants' first motion for

---

[1] The parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been rescinded for purposes of these motions, and as such, any appeal taken from this order, if appropriate, will be to the Court of Appeals for the Second Circuit.

[2] Defendants have filed two motions for judgment on the pleadings because defendant Nurses Karen Dooley; and Theresa LaLonde and defendant Mail Room Supervisor, Diane Kastia were served subsequent to defendants' original motion for judgment on the pleadings. *See* (Dkt. Nos. 70, 71, 73).  The second motion for judgment on the pleadings was filed on behalf of the three later-served defendants. (Dkt. No. 76).

judgment on the pleadings, plaintiff filed a "Motion for Sanctions" and a "Motion to Strike Insufficient Defense and Rule 12(c) Motion." (Dkt. Nos. 53, 61).  Defendants have responded to both of plaintiff's motions. (Dkt. Nos. 57, 66).  For the following reasons, this court agrees with defendants and will deny plaintiff's motions and grant the defendants' motions for judgment on the pleadings, dismissing this action in its entirety.

**DISCUSSION**

1.     <u>**Judgment on the Pleadings**</u>

After the pleadings are closed, a motion to dismiss for failure to state a claim is properly brought as a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). *Maggette v. Dalsheim*, 709 F.2d 800, 801 (2d Cir. 1983) (citations omitted).  *See* Fed. R. Civ. P. 12(b), 12(c) and 12(h)(2).  The motion for judgment on the pleadings is then treated according to the same standard as a motion to dismiss under Rule 12(b)(6). *Id.*

To survive a motion to dismiss, the plaintiff must provide "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *Camarillo v. Carrols Corp*., 518 F.3d 153, 156 (2d Cir. 2008)(quoting *inter alia ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Plaintiff's factual allegations must be sufficient to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Id.* (citing *Port Dock & Stone Corp. v. Oldcastle Ne., Inc*., 507 F.3d 117, 121 (2d Cir. 2007)).  When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (citations omitted).  The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005); *Tapia-Ortiz v. Doe*, 171 F.3d 150, 152 (2d Cir. 1999)(*per curiam*).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)(citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)).

**2.** **Facts**[3]

Because defendants have made motions for judgment on the pleadings, all the statements in plaintiff's complaint are assumed to be true. *Erickson*, 127 S. Ct. at 2200.  The court will recite the facts as stated by plaintiff.  Plaintiff begins the amended complaint by stating that on February 13, 2007,  he was incarcerated at Marcy Correctional Facility. AC ¶ 12.  At approximately 1:30 p.m., while plaintiff  was working at his job as an Inmate Law Clerk in the facility Law Library, he began to lose feeling on the right side of his body. *Id.*  Plaintiff states that his supervisor allowed plaintiff to return to his housing unit. *Id.*  He requested "Sick Call" on February 15, 2007.[4] AC ¶ 14.  At approximately 6:15 a.m. on February 15, 2007, defendant Poole was called to plaintiff's housing unit with a van to take plaintiff to the facility Clinic because plaintiff was having trouble walking on his own. AC ¶ 15.

Plaintiff states that when the van arrived at the Clinic, plaintiff saw defendant Nurse Theresa Howard standing at the door. *Id.*  He recognized defendant Howard because plaintiff  had an "ongoing conflict" with this defendant, resulting in plaintiff filing a grievance against her. *Id.* Plaintiff concedes that defendant Howard was not assigned to assist plaintiff, but was merely waiting

---

[3] Plaintiff's amended complaint is quite lengthy and contains fourteen causes of action, including two "pendent" causes of action. AC ¶¶ 12-34 (Facts), ¶¶ 35-89 (twelve federal causes of action), and ¶¶ 90-96 ("pendent" state claims).

[4] Plaintiff claims that he waited until February 15, 2007 because "Sick Call" was not available on February 14th. AC ¶ 13.

for the van so that she could be transported to her assigned duty station for the day. *Id.* When the van arrived, defendant Poole asked defendant Howard to open the van door so that plaintiff could get out. Plaintiff states that as he attempted to exit the van, he began to "pitch forward," and instead of assisting plaintiff, defendant Poole remained in the driver's seat of the van and watched while plaintiff fell to the ground hitting his head, back, and right side of his body. *Id.* Plaintiff claims that defendant Howard merely jumped out of plaintiff's way and let him fall to the ground. *Id.*

Plaintiff also alleges that although various inmates who observed plaintiff fall attempted to assist him, defendant Howard told the inmates to "stand back." Without first checking plaintiff for injuries, defendant Howard walked into the Clinic to get plaintiff a stretcher and to notify defendant Corrections Officer Farley and her "fellow nurses" about the incident. Defendant Howard returned with a stretcher and two inmate porters who assisted plaintiff onto the stretcher. Defendant Howard then got into the van with defendant Poole, and they drove away. *Id.* Plaintiff states that none of the three defendants (Poole, Howard, or Farley) wrote or filed an Unusual Incident Report and/or an Inmate Injury Report in violation of Department of Correctional Services (DOCS) Directive # 4605. *Id.* Plaintiff claims that due to the gross negligence of these three defendants, he was injured.

After plaintiff was wheeled into the Emergency Treatment Room (ETR), plaintiff was informed by an unknown nurse[5] that plaintiff was going to be examined by defendant Dr. Syed Haider-Shah. AC ¶ 16. Plaintiff "voiced his desire not to be seen by Defendant [Haider-Shah]," but stated that he was willing to be examined by any other doctor. *Id.* Plaintiff claims that he never actually refused to be seen by Dr. Haider-Shah, however, defendant Nurse LaLonde misinterpreted

---

[5] Plaintiff states that this nurse was not wearing a name tag in violation of New York Regulations. Plaintiff cites section 29.1 of Title 8 of the New York Code of Rules and Regulations. NEW YORK CODE RULES & REGS tit.8, § 29.1. This particular section governs "Unprofessional Conduct." Section 29.1 contains "General provisions," defining unprofessional conduct. Failure to wear a name tag is not included in this section.

4

plaintiff's statement and asked plaintiff to sign a "Medical Refusal Form." *Id.*  Plaintiff claims that when he refused to sign the form, defendant LaLonde, called defendant Nurse Karen Dooley, and asked her to sign the form, disregarding plaintiff's desire to be examined by a doctor. *Id.*

Defendants LaLonde and Dooley went to inform defendant Administrative Nurse Martin-Karas, who came in the room to speak with plaintiff. AC ¶ 17.  Plaintiff states that although he tried to explain the situation, defendant Martin-Karas had plaintiff removed from the Clinic by defendant Corrections Officer Farley. *Id.*  Plaintiff also claims that defendant Martin-Karas told plaintiff not to return. *Id.*  Plaintiff states that no defendant explained the risks of leaving the Clinic without first obtaining medical treatment. *Id.*

Plaintiff left the Clinic because he was afraid that he would be charged with refusing a direct order if he did not leave voluntarily. AC ¶ 18.  Plaintiff also states that he was afraid that "acts of retaliation would follow." *Id.*  When he returned to his housing unit, plaintiff  reported the incident to defendant Corrections Officer Grant, and told defendant Grant that defendant Martin-Karas made it clear that plaintiff was not to return to the Clinic "for anything." AC ¶ 19.  At approximately 8:30 a.m. on February 15, 2007, plaintiff discovered that he was urinating blood. AC ¶ 20.  Plaintiff claims that he told defendant Grant, who asked plaintiff if he wished to go to the Clinic. *Id.*  Plaintiff states that he was concerned that if he went back to the Clinic, defendant Farley would charge him with misbehavior since defendant Martin-Karas told plaintiff not to return to the Clinic. *Id.*  Plaintiff speculated that the blood could be related to his fall from the van earlier that morning. *Id.*

Plaintiff states that defendant Howard never filed a "Report of Inmate Injury" related to plaintiff's fall out of the van. AC ¶ 21.  On March 6, 2007, after a conversation with his corrections counselor, plaintiff decided to file a grievance regarding defendant Howard's failure to file the proper incident report in violation of DOCS directives. *Id.*  Plaintiff filed four grievances that were

consolidated by the Grievance Supervisor. *Id.*  Plaintiff complains that his grievances were not properly handled. AC ¶¶ 22-25.  Plaintiff had a grievance hearing on March 27, 2007, but the committee was deadlocked. AC ¶ 22.  Plaintiff alleges that DOCS uses this "deadlock" as a method to avoid making a decision to correct "medical errors." *Id.*

Plaintiff appealed the committee's decision, and on April 10, 2007 defendant Superintendent Lape denied plaintiff's grievance. AC ¶ 23.  Plaintiff states that he appealed the Superintendent's decision to the Central Office, and that during this time, he still had not seen a doctor regarding the numbness on the right side of his body.  Plaintiff states that defendants LaLonde, Dooley, and Karas prevented plaintiff from seeing a doctor on February 15, 2007, and that no one corrected that error. *Id.*

On April 23, 2007, plaintiff  wrote a letter to defendant Constant, the Director of Nursing and Auxiliary Services, complaining about the actions of defendants Howard, LaLonde, Dooley, and Karas. AC ¶ 24.  Although defendant Constant responded to his letter, she did not address any of the issues that plaintiff raised. *Id.*  Instead, she suggested that plaintiff go to sick call and have his issues addressed by the medical staff. *Id.*  Plaintiff states that he understood defendant Constant to mean that plaintiff could go back to the Clinic without fear of "medical retaliation." *Id.*  On May 18, 2007, plaintiff again put his name on the list for sick call, and apparently saw an unnamed nurse who scheduled plaintiff to see Dr. Haider-Shah on May 27, 2007. *Id.*

Plaintiff states that on May 7, 2007, he wrote a letter to DOCS Commissioner, defendant Brian Fischer, detailing all of the above complaints. AC ¶ 25.  Defendant Fischer sent plaintiff's letter to defendant Dr. Lester Wright, DOCS Chief Medical Officer, for investigation. *Id.*  Defendant Wright wrote to plaintiff on May 18, 2007, stating that the department had conducted an investigation into the events of February 15, 2007, and that the staff of the Primary Care Unit was not responsible for maintaining injury reports. *Id.*  Plaintiff claims that this answer had nothing to do with the

complaints that plaintiff filed. *Id.*

Plaintiff saw defendant Dr. Haider-Shah on May 7, 2007.[6] AC ¶ 26.  Plaintiff told Dr. Haider-Shah about the right-sided numbness and about plaintiff's fall from the van on February 15, 2007. AC ¶ 26.  Plaintiff also told the doctor that defendant Martin-Karas told plaintiff not to return to the Clinic, and Dr. Haider-Shah told plaintiff that he "knew all about it." *Id.*  Plaintiff asked Dr. Haider-Shah if the doctor was aware of plaintiff's degenerative bone condition, and the doctor stated that he was aware of the condition.  Plaintiff asked whether the doctor was going to do anything about plaintiff's condition, and the doctor did not reply.  Plaintiff claims that defendant Haider-Shah "kept himself informed about Plaintiff's health but never intended to do anything about it." *Id.*  Plaintiff states that defendant Haider-Shah admitted that he had no plans to treat plaintiff for his degenerative condition. *Id.*

Plaintiff had another appointment with Dr. Haider-Shah on May 25, 2007 to review a May 8, 2007 x-ray report. *Id.*  Plaintiff states that Dr. Haider-Shah learned from the x-ray that plaintiff had a problem in his neck and scheduled plaintiff to see a neurologist on June 15, 2007. *Id.*  The neurologist ordered three MRI examinations for September 21, 2007.  Plaintiff saw Dr. Haider-Shah on August 27, 2007, discussed his treatment, and asked the doctor if he would order an Electromyogram (EMG).  However, Dr. Haider-Shah refused to order the test.  Plaintiff filed a grievance about the refusal, but again, the committee was deadlocked.  Plaintiff claims that the deadlock was "designed to prolong much needed Medical attention and treatment." *Id.*

On June 1, 2007, plaintiff again wrote to Commissioner Fischer about defendant Howard's failure to file a proper incident report after plaintiff fell out of the van on February 15, 2007. AC ¶ 27.

---

[6] In paragraph 24, plaintiff states that he was scheduled to see Dr. Haider-Shah on May 27, 2007, however, in paragraph 26, plaintiff states that he saw Dr. Haider-Shah on May 7, 2007.  It is unclear whether plaintiff saw the doctor earlier than expected or whether one of the dates is a typographical error.

Defendant Fischer again sent plaintiff's letter to defendant Wright for investigation, who copied his

May 18, 2007 response and sent it to plaintiff again. AC ¶ 28.  On July 17, 2007, plaintiff wrote

another letter to defendant Fischer, informing him that the staff had entered into a conspiracy to

submit false statements. *Id.*

Defendant Wright sent plaintiff's June 1, 2007 letter to defendant Sally Baxter, Nurse

Administrator for investigation. AC ¶ 29.  Defendant Baxter told plaintiff in a letter dated July 5,

2007, that her investigation showed that all treatments were appropriate. *Id.*  However, plaintiff states

that none of his complaints have been addressed.  By letter dated June 4, 2007, defendant Kelleher,

Director of Nurse Investigations was asked[7] to conduct an investigation and inform plaintiff of the

findings. *Id.*  Plaintiff states that as of the date of the amended complaint, plaintiff had not received

any report, indicating that an investigation was conducted or that a hearing was scheduled.

On July 12, 2007, defendant Wright sent plaintiff a letter stating that defendant Howard

claimed that she never witnessed the February 15, 2007 incident because she was assigned to S-Block

that day. AC ¶ 30.  Plaintiff states that defendant Wright's letter stated that plaintiff was "Unwilling

to Remain" for the examination by the primary care provider. *Id.*  Plaintiff claims that the statements

in defendant Wright's letter were false, and that plaintiff never refused to see Dr. Haider-Shah. *Id.*

On July 30, 2007, plaintiff fainted in his housing unit and was taken to the Clinic on a

stretcher. AC ¶ 31.  Plaintiff claims there was no medical staff supervision on his way to the Clinic.

Plaintiff states that from the Clinic, he was sent to St. Elizabeth Medical Center.  Plaintiff states that

no one ever determined why he fainted.  Plaintiff states that he later requested a copy of the medical

records from the hospital, but when they arrived at the facility, someone opened them improperly, and

---

[7] The amended complaint does not indicate who sent plaintiff's letters to defendant Kelleher for investigation.  The court assumes that plaintiff sent the information to this defendant by letter of June 4, 2007. AC ¶ 29.

defendant Diane Kastia, Mail Room Supervisor sent the records to plaintiff. *Id.* Plaintiff has been unable to determine who opened this envelope or whether any medical records were removed. Plaintiff filed a grievance about this incident.  The hearing was held on September 18, 2007, but plaintiff had to file another grievance on September 10, 2007 because the "same thing happened again."  Plaintiff states that the second time that he received medical records in the mail, they were sent to the Clinic because defendant Kastia knew of plaintiff's previous grievance, and she "joined in the conspiracy" to violate plaintiff's constitutional rights and "use this procedure to retaliate against plaintiff for filing [sic] Grievance in this matter." *Id.* Plaintiff claims that defendant Kastia violated plaintiff's Fourth Amendment rights because she should have known that hospital records are protected by privacy laws. AC ¶ 32.

On July 24, 2007, plaintiff received a letter from defendant Karen Bellamy, the Director of the Inmate Grievance Program, responding to a letter that plaintiff had written to defendant Fischer, telling plaintiff that there were no more appeals for one of his grievances. AC ¶ 33.  Plaintiff states that this letter was an attempt to misdirect plaintiff because plaintiff "merely asked Defendant [Fischer] to review the grievances and send orders to the staff, telling them to correct the mistakes that were made in failing to file the appropriate incident and injury reports. *Id.* On September 17, 2007, plaintiff wrote to defendant Bellamy, complaining about the unprofessional conduct taking place in the Grievance Office. AC ¶ 34.  Plaintiff states that he never received a response, a "clear example" of how defendant Bellamy has failed to carry out her duties to correct a wrong.

**3.**    **Motion for Sanctions**

Plaintiff has moved to sanction defendants pursuant to Fed. R. Civ. P. 11.  Rule 11 specifically provides for 21 days notice to the opposing party prior to filing a motion for sanctions. *Id.* Rule 11(c)(2).  Plaintiff's motion for sanctions was filed the day after defendants moved to dismiss

plaintiff's action pursuant to FED. R. CIV. P. 12(c). (Dkt. Nos. 52-(Motion to Dismiss- 5/21/08); 53-(Motion for Sanctions-5/22/08).  For that reason alone, plaintiff's motion may be denied.

Defendants, however, have responded in opposition to the substance of the motion, and a review of the defendants' memorandum in opposition to the motion shows that plaintiff's request for Rule 11 sanctions may be denied  regardless of the improper timing of the motion.  Plaintiff accuses defendants of a variety of violations, including "intentional delay" by filing and withdrawing a previous motion to dismiss.  Plaintiff also faults defendants for requesting a stay of discovery pending the court's decision on the motion for judgment on the pleadings and accuses defendants of "evading" service.  Plaintiff has problems with defendants filing papers on the "eve" of a deadline.

The fact that a party files a paper on the eve of a deadline is not a reason for sanctions.  The fact that a party asks for an extension of time to file an answer or a motion is not a reason for sanctions and does not represent an intentional delay of the action.  Plaintiff has not been prejudiced by any extensions requested by defense counsel.  In fact, plaintiff obtained the names of the "Jane Doe" defendants and amended his complaint, allowing for service on these defendants.  As defense counsel states in her response, the Attorney General's Office has nothing to do with service on defendants.  Service is accomplished by the United States Marshal on behalf of plaintiff's proceeding *in forma pauperis*.  The Attorney General's Office does not represent individual defendants until they request representation ***after being served*** with the complaint.

There is nothing sanctionable in withdrawing a motion to dismiss when new defendants have been served, who may request legal representation from the same counsel.  In addition, when an amended complaint is filed, defendants have withdrawn  motions to dismiss that are addressed to the original complaints. *See e.g. Sniado v. Bank Aus. AG*, 352 F.3d 73, 76-77 (2d Cir.), *vacated and remanded on other grounds*, 542 U.S. 917 (2004).  Additionally, while a motion to dismiss does not

automatically stay discovery, a motion to dismiss may in some instances "provide 'good' cause for a protective order . . . staying discovery." *Spencer Trask Software & Information Services*, 206 F.R.D. 367, 368 (S.D.N.Y. 2002), *cited in Picture Patents, LLC v. Terra Holdings*, 2008 U.S. Dist. LEXIS 98030, *7 (S.D.N.Y. Dec. 3, 2008). Thus, there is nothing sanctionable in defendants' request for a stay of discovery, pending a decision on their motions to dismiss.

The court has reviewed all of plaintiff's bases for requesting sanctions and finds that none of them may succeed. Thus, plaintiff's motion for sanctions (Dkt. No. 53) is *denied*.

### 4.   <u>Motion to Strike</u>

Plaintiff has also moved to strike the Rule 12(c) motion and "certain paragraphs of the accompanying answer." (Dkt. No. 61). The answer that was filed immediately prior to the motion for judgment on the pleadings was the answer to the amended complaint, filed by the then-served defendants. (Dkt. No. 51). The three remaining defendants filed their answer after they had been served with process. (Dkt. No. 75).

In support of his motion, plaintiff states that motions for judgment on the pleadings are not "favored" by the Second Circuit. While the standard is strict,[8] and as stated above, all the factual statements in the complaint are still accepted as true for purposes of a motion for judgment on the pleadings, the case the plaintiff cites does not state that the motion is "disfavored." *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551 & n.2 (2d Cir. 1977).

However, the court notes that it is motions to *strike* defenses that are "not favored" and will not be granted unless the insufficiency is "clearly apparent." *Mastrocchio v. Unnamed Supervisor Special Inv. Unit*, 152 F.R.D. 439, 441 (D.R.I. 1993)(quoting *Louisiana Sulphur Carriers, Inc. v. Gulf*

---

[8] Although plaintiff states in a footnote that the standard for a motion to dismiss has not changed, he is incorrect. In *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the court did away with the "no set of facts" language.

*Resources and Chemical Corp.*, 53 F.R.D. 458, 460 (D. Del. 1971)). *See also Allstate Ins. Co. v. Choi*, 2007 U.S. Dist. LEXIS 249, \*27 (E.D.N.Y. Jan. 2, 2007).  In *Louisiana Sulphur Carriers, Inc.*, the court stated that motions to strike are often denied, even when they are technically correct and well-founded because of their dilatory character and tendency to create piecemeal litigation. *Id.*  A motion to strike defenses should only be granted where it can be shown that the defense could not succeed under any set of circumstances. *Id.* at 440-41 (citing *Narragansett Tribe of Indians v. So. R.I. Land Devel.*, 418 F. Supp. 798, 802 (D.R.I. 1976)).

In this case, plaintiff asks the court to strike the motion for judgment on the pleadings as well as various defenses listed in the answer, including the defense of failure to state a claim. (Dkt. No. 61 at p.2).  Plaintiff claims that the defendants have already admitted that plaintiff states a constitutional claim.  Plaintiff is referring to defendants' memorandum of law in support of their motion for judgment on the pleadings. (Dkt. No. 52 at p.1).  In defendants' "Preliminary Statement," they state as follows:

> . . . As demonstrated below, the plaintiff's perceived threats, insults and shortcomings of corrections personnel outlined in the amended complaint, merely exemplify plaintiff's ***unfounded*** belief that he is entitled to have it his way while incarcerated in a penal institution. ***They do amount to actionable constitutional violations***.  Based upon the facts alleged, therefore, ***plaintiff cannot state a cause of action for which relief may be granted, and the amended complaint must be dismissed***.

*Id.* (emphasis added).  Plaintiff seizes upon the second sentence above, in arguing that defendants admit that he does state a claim.  However, it is clear from the sentence before and the sentence following the statement in question that the sentence plaintiff refers to clearly contains a typographical error.  Defendants clearly meant to state that plaintiff's claims "do [not] amount to actionable constitutional violations."  Otherwise, the other two sentences, and the entire motion do

not make sense.  The last sentence above states clearly that defendants are arguing that plaintiff "cannot state a cause of action."  This court will strike **neither** the motion **nor** the defense of failure to state a claim based upon a typographical error in the defendants' memorandum of law.

The court has reviewed the rest of the defenses that plaintiff wishes the court to strike, and while it does seem that some of the defenses are not applicable to plaintiff's case, since this court is dismissing this action for failure to state a claim, the fact that there are inapplicable defenses in the answer does not affect this court's decision.[9]

**5.    Eleventh Amendment**

The state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD*, 64 F.3d 810, 815 (2d Cir. 1995)(citing *Will v. Michigan Department of Police*, 491 U.S. 58, 71 (1989)). This is true whether the court is considering Eleventh Amendment immunity or a statutory interpretation of section 1983. *Id.* at 815 n.3.  An action against state officers in their official capacities is tantamount to an action against the state.  *Yorktown Medical Laboratory, Inc. v. Perales*, 948 F.2d 84, 87 & n.1 (2d Cir. 1991)(citations omitted).

The caption of plaintiff's complaint states that he is suing defendants in their "Individual and Official Capacities." (Dkt. No. 38).  To the extent that plaintiff is attempting to sue defendants for damages in their official capacities or to the extent that his complaint can be interpreted as raising such official capacity claims, he is barred by the Eleventh Amendment from doing so.  Any such claims are dismissed.

---

[9] The court does note, however, that this court's dismissal will be without prejudice.  If plaintiff should succeed in presenting a future amended complaint that may proceed, the court will admonish defendants to review their defenses, and raise the defenses that actually may apply to the facts.  Although not making any specific findings on the issue, the court refers to the defenses of "res judicata;" "statute of limitations," failure to properly serve," "failure to acquire personal jurisdiction over defendants based on improper service," and redundant defenses (¶¶ 24 and 25 of the answer filed May 21, 2008).  The court notes that the same errors were made in the answer filed on July 29, 2008. (Dkt. No. 75).

6.      **Personal Involvement**

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)(citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction.  *Id.*  The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong.  *Id.*  Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue.  *Id.*  Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event.  *Id.  See Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

In this case, defendants argue that plaintiff has not alleged sufficient personal involvement of defendants Lape, Constant, Fischer, Wright, Baxter, Bellamy, and Kelleher.

A.      **Defendants Constant, Fischer, Wright, Baxter, and Kelleher**

Plaintiff's only allegation against defendant Director of Nursing and Auxiliary Services Donna Constant states that on April 23, 2007, plaintiff  wrote a letter to defendant Constant, complaining about the February 15, 2007 actions of defendant Nurses Howard, LaLonde, and Dooley, together with Nurse Administrator Martin-Karas. AC ¶ 24.  Plaintiff claims that although defendant Constant wrote back to plaintiff, suggesting that he go to sick call and have his medical issues

14

addressed, she did not address any of plaintiff's other issues. *Id.*  Plaintiff states that as a result, he did

go to sick call and was scheduled to see the doctor. *Id.*

In plaintiff's causes of action, he suddenly accuses defendant Constant of failing to train her

subordinates regarding "reporting and responding to accidents." AC ¶¶ 57-63.  He accuses her of

conspiring with other defendants in failing to instruct medical personnel on correct procedures on the

proper use of the Medical Facility and proper treatment. AC ¶ 60.  Finally, he states that somehow

this defendant was responsible for plaintiff's injuries. AC ¶ 61-62.  He includes this language in all of

the causes of action against supervisory personnel.

Plaintiff simply has not stated any facts to support any of these conclusory allegations that he

makes at the end of his amended complaint.  Defendant Constant's apparent failure to answer to

plaintiff's satisfaction  *one* letter written to her is insufficient to allege her personal involvement.

Generally, the failure of a supervisory official to respond to a letter of complaint is insufficient to

create personal responsibility. *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997); *Smart v. Goord*, 441

F. Supp. 2d 631, 642-643 (S.D.N.Y. 2006).  Additionally, conclusory allegations are insufficient to

state a claim under section 1983. *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987).  There are

absolutely no facts to support plaintiff's conclusory claim of personal involvement.

The same is true for defendant Fischer.  Defendant Fischer is the Commissioner of DOCS.  In

the body of the amended complaint, plaintiff states that he wrote a letter to defendant Fischer on May

7, 2007, clearly stating all of plaintiff's complaints regarding his medical care, including the

defendant nurses' failure to file an injury report. AC ¶ 25.  Plaintiff also informed defendant Fischer

that plaintiff wrote a letter to defendant Constant.  Plaintiff also states that he wrote to defendant

Fischer on June 1, 2007, and July 17, 2007. AC ¶¶ 27, 28.  Plaintiff claims that defendant Fischer

referred plaintiff's letters to defendant Lester Wright for investigation. AC ¶ 25, 28.

Defendant Wright sent plaintiff a letter stating that the Division had conducted an investigation into the matter and told plaintiff that the staff of the medical unit was not responsible for maintaining injury reports. AC ¶ 25. Defendant Wright also sent plaintiff another letter in response to the second request from defendant Fischer. AC ¶ 28. Plaintiff claims that it was a copy of the same letter. *Id.* As stated above, defendant Fischer's referral of plaintiff's letter to a subordinate for investigation does not make defendant Fischer personally responsible for any of the claims alleged in the letter. *Sealey, supra.*

Plaintiff states that he wrote to defendant P. Daniel Kelleher, the Director of Nurse Investigations in New York City. AC ¶ 29. Plaintiff states that he never heard from defendant Kelleher, and there is nothing to show that an investigation was conducted or a hearing scheduled. *Id.* Plaintiff has shown no personal involvement by defendant Kelleher.

It appears from plaintiff's complaint that defendant Lester Wright, M.D., Deputy Commissioner and Chief Medical Officer of DOCS also referred plaintiff's letters to another individual for investigation. Plaintiff states that defendant Wright referred plaintiff's letter of June 1, 2007 to defendant Sally Baxter, Nurse Administrator, who wrote plaintiff a letter on July 5, 2007, stating that defendant Karas had informed defendant Baxter that according to defendant Dr. Haider-Shah, all plaintiff's medical treatments were appropriate. AC ¶ 29. However, plaintiff states that on July 12, 2007, defendant Wright wrote to plaintiff, stating for the first time, that defendant Howard claimed that she did not witness the February 15, 2007 incident. It is unclear whether this additional involvement with plaintiff's investigation would render defendant Wright and Baxter more personally involved with any allegations that plaintiff might be attempting to make. Thus, this court will not dismiss the case against defendants Wright and Baxter on the basis of lack of personal involvement. The court will dismiss the case against these defendants on an alternative basis.

16

### B.      Former Superintendent Lape

Defendant Lape is the former Superintendent of Marcy Correctional Facility.  He is alleged to have denied plaintiff's first four consolidated grievances after the grievance committee was deadlocked. AC ¶ 23.  Plaintiff alleges that defendant Lape denied the grievance himself, and that plaintiff had included his claims of denial of medical care, thus, this court will not dismiss this action against defendant Lape for lack of personal involvement.

### C.      Karen Bellamy

Karen Bellamy is the Director of the Inmate Grievance Program.  The extent of her involvement in plaintiff's case was to respond to a letter that plaintiff wrote to defendant Fischer, explaining to plaintiff that he could not appeal a grievance by writing to the Commissioner, and that there were no further appeals for Grievance No. MCY-12790-07. AC ¶ 33.  Plaintiff claims that this was an attempt to misdirect plaintiff. *Id.*  Plaintiff also alleges that he wrote to defendant Bellamy on September 17, 2007, complaining about unprofessional actions that were taking place in the Grievance Office, but defendant Bellamy did not respond.  Her failure to respond to plaintiff's letter does not make her personally responsible for any of plaintiff's complaints, and the amended complaint may be dismissed against her in its entirety for lack of personal involvement and for lack of merit as discussed below.

### 7.      Medical Care

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  There are two elements to the deliberate indifference standard.  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  The first element is objective and measures the severity of the deprivation, while the second

element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

In order to meet the first element of the standard, plaintiff must show that he has a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition has been considered "sufficiently serious" when there is a "condition of urgency," one that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). The seriousness of a plaintiff's medical need may also be determined by reference to the effect of denying the particular treatment. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 310 (S.D.N.Y. 2001)(citation omitted). Thus, if unnecessary and wanton infliction of pain results from the denial of treatment, or if the denial of treatment causes the inmate to suffer a lifelong handicap or permanent loss, the condition may be considered "sufficiently serious." *Id.* (citing *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000)).

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care. *Id.* (citing *Estelle*, 429 U.S. at 105-106). Instead, plaintiff must show that the defendants were "deliberately indifferent" to that serious medical condition. Id. In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance*, 143 F.3d at 702). The defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Disagreement with prescribed treatment does not rise to the level of a constitutional claim. Sonds, 151 F. Supp. 2d at 311. Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have

18

the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1086).  The fact

that plaintiff might have preferred an alternative treatment or believes that he did not get the medical

attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for

specialists, and the timing of their intervention implicate medical judgments and not the Eighth

Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing Estelle, 429 U.S. at 107).  Even if those medical

judgments amount to negligence or malpractice, malpractice does not become a constitutional

violation simply because the plaintiff is an inmate.  *Id.  See also Daniels v. Williams*, 474 U.S. 327,

332 (1986)(negligence not actionable under Section 1983).  Thus, any claims of malpractice, or

disagreement with treatment are not actionable under Section 1983.

### A.     Dr. Haider-Shah

In this case, plaintiff seems more concerned with the alleged failure of defendants to report the

February 15, 2007 incident than with the care that he received.  Plaintiff alleges that the defendants'

conduct "was not conducive to the Goals of Professional performance of their duties . . . ." AC ¶ 36.

To the extent that plaintiff claims that the defendants did not properly report the incident or were

"unprofessional," or even violated state law, he cannot pursue a section 1983 action on those bases.

With respect to Dr. Haider-Shah, plaintiff basically claims that he disagreed with the treatment that

the doctor gave plaintiff.  Plaintiff infers from Dr. Haider-Shah's silence on the subject of plaintiff's

alleged degenerative bone "condition," that the doctor knew about the condition, but did not intend to

do anything about it.  A disagreement with the doctor's treatment or lack of treatment for a condition

is not the basis for a constitutional violation.

The court would point out that plaintiff states that on May 8, 2007, Dr. Haider-Shah reviewed

x-rays with plaintiff, in which the doctor learned about problems in plaintiff's neck. AC ¶ 26.

Plaintiff states that Dr. Haider-Shah then scheduled plaintiff to see a neurologist, and that the neurologist scheduled three MRI examinations. *Id.*  Plaintiff then takes issue with the fact that Dr. Haider-Shah refused to order an EMG on August 27, 2007. *Id.*  Once again, plaintiff's disagreement with Dr. Haider-Shah's medical decision is not the basis for a civil rights action.  Thus, this case may be dismissed as against Dr. Haider-Shah.

### B.      Nurses Howard, LaLonde, Dooley, and Martin-Karas

The only allegations that plaintiff makes against Nurse Howard is that she let plaintiff fall out of the van, and she did not check him for injuries before she went to get the stretcher.  Plaintiff also states that she improperly failed to complete an Unusual Incident Report and an Inmate Injury Report in violation of regulations and Directives.  Failure to complete reports is simply not an Eighth Amendment claim under any view of the facts.  Whether defendants were unprofessional and in violation of their duty to wear name tags is not actionable under section 1983.  The worst that can be said for Nurse Howard is that she did not catch plaintiff when he fell out of the van.  Whether Nurse Howard was negligent in failing to catch plaintiff and whether she should have checked him for injuries prior to getting help for him does not rise to the level of deliberate indifference even if plaintiff alleges that he was seriously injured as a result of the fall.[10]  *See Daniels v. Williams, supra.* Thus, this complaint may be dismissed as against Nurse Howard.

Plaintiff claims that when he was taken into the Clinic on February 15, 2007, he was told by an unnamed nurse that he would be examined by Dr. Haider-Shah. AC ¶ 16.  Plaintiff states that he voiced his desire not to be examined by Dr. Haider-Shah, but agreed to be seen by any other facility doctor. *Id.*  Defendant LaLonde apparently interpreted plaintiff's statement to mean that he was

---

[10]  The court notes that plaintiff never alleges that he was seriously injured or that he needed emergency assistance after he fell out of the van.  In fact, his concern when he entered the Clinic was that he not be examined by Dr. Haider-Shah.

refusing to see Dr. Haider-Shah and attempted to get plaintiff to sign a Medical Refusal form.  When plaintiff did not do so, defendant LaLonde called defendant Dooley to witness the refusal, allegedly disregarding "plaintiff's desire to be seen by a doctor, as an emergency medical need." *Id.*  Defendant Martin-Karas was called to the area, and according to plaintiff, ordered him out of the Clinic, never to return. AC ¶ 17.

The court notes that plaintiff could not dictate who would or would not examine him. Plaintiff states that he only "voiced a desire" to see a different doctor, but that defendants, particularly defendant Martin-Karas had their minds made up.  There are no facts in the complaint that would indicate that defendants LaLonde and Dooley would have known that plaintiff had a serious medical need that was not being addressed.  Plaintiff admits that he voiced a desire not to be examined by Dr. Haider-Shah, but that he would be examined by another doctor.  Although plaintiff states that he attempted to explain that he would see any other doctor, plaintiff essentially caused his own delay in obtaining medical care.  Plaintiff cannot blame the defendants when he started the delay by stating that he did not wish to see Dr. Haider-Shah. *See Ross v. Kelly*, 784 F. Supp. 35, 46-47 (W.D.N.Y.) (plaintiff cannot blame the defendants when he is largely to blame for the delay), *aff'd*, 970 F.2d 896 (2d Cir.), *cert. denied*, 506 U.S. 1040 (1992).

 Plaintiff's own statements do not indicate that he was experiencing any emergency situation of which defendants LaLonde and Dooley would have been aware.  Plaintiff states that a nurse came into the emergency treatment room to remove the "medical equipment," so that plaintiff could "leave as best he could since he was in so much pain." AC ¶ 18.  However, plaintiff left the Clinic area by himself, and there is no indication that he told defendants LaLonde, Dooley, or Martin-Karas that he was in "so much pain."  Thus, plaintiff has not alleged an Eighth Amendment claim against these nurses.

### C.    Corrections Officer Poole

The only claim that plaintiff makes against defendant Poole is that he did not get out of the van to help plaintiff.  Because defendant Poole did not do so, he was not there when plaintiff lost his balance and fell out of the van.  Plaintiff also appears to fault defendant Poole for not getting out of the van after plaintiff fell.  At best, any allegations against this defendant are based upon negligence and not deliberate indifference.  As stated above, negligence is not actionable under section 1983. There is no indication that defendant Poole was aware that plaintiff would lose his balance and fall out of the van, and if defendant Poole violated some State regulations regarding the transportation of inmates to the Clinic, there still would be no constitutional claim stated.  A violation of state law requirements alone, does not rise to the level of a constitutional violation. *Dixon v. Goord*, 224 F. Supp. 2d 739, 744-45 (S.D.N.Y.  2002). *See Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990)).

### D.    Corrections Officers Farley and Grant

It is unclear what plaintiff claims against defendant Farley.  Apparently Officer Farley was present in the Clinic on February 15, 2007. AC ¶¶ 15, 17.  Plaintiff first states that after he fell out of the van, defendant Howard went into the Clinic to tell the other nurses, arrange for a stretcher, and inform defendant Farley. AC ¶ 15 at p.8.  There is no claim against defendant Farley in this statement. The only other mention of defendant Farley is that after defendant Martin-Karas ordered plaintiff out of the Clinic, she told Officer Farley to order plaintiff to leave the area without allowing anyone to inform plaintiff "of the risks of leaving the Clinic area without medical treatment." AC ¶ 17.  This statement sounds more like a complaint against defendant Martin-Karas than Officer Farley.  There simply is no statement in the amended complaint that would approach deliberate indifference to anything by Officer Farley.  He appears to have merely been the officer assigned to the Clinic on February 15, 2007.  Thus, the complaint may be dismissed as to defendant Farley.

The same is true for defendant Officer Grant.  Plaintiff states that when he returned to his housing unit after the February 15, 2007 incident at the Clinic, he told defendant Grant what happened and told defendant Grant that defendant Martin-Karas told plaintiff not to return to the clinic. AC ¶ 19.  Defendant Grant was the housing unit officer.  Plaintiff then states that later that morning, he informed defendant Grant that plaintiff had blood in his urine. AC ¶ 20.  The amended complaint states that defendant Grant asked plaintiff if he wanted to go to the Clinic, but plaintiff told defendant Grant that plaintiff had been forbidden from returning to the Clinic. *Id.*  Plaintiff told defendant Grant that plaintiff was afraid that he would get a misbehavior report if defendant Grant attempted to call the Clinic about the blood in plaintiff's urine. *Id.*

A review of the amended complaint shows that plaintiff does not allege any wrongdoing against either defendants Farley or Grant, and certainly no facts even approaching a statement of deliberate indifference to plaintiff's serious medical needs.  Defendant Grant merely asked plaintiff if he wished to go to the Clinic.  Plaintiff declined the assistance.  Thus, the amended complaint may be dismissed as against these two defendants.

**8.**      **Grievance/Investigative  Procedures**

 To the extent that plaintiff claims that his grievances were handled improperly or unprofessionally, courts have consistently held that because grievances procedures are undertaken voluntarily by New York and other states, they are ***not constitutionally required***. *See Ramos v. Hanslmaier*, 96 Civ. 744, 1997 U.S. Dist. LEXIS 6082, *6-7 (S.D.N.Y. Feb. 19, 1997)(multiple citations omitted). *See also Bullock v. Horn,* CV-99-1402, 2000 U.S. Dist. LEXIS 21573, *22-23 (M.D. Pa. 2000)(plaintiff claimed improper refusal to process grievance); *Hoover v. Watson*, 886 F. Supp. 410, 418-19 (D. Del.), *aff'd*, 74 F.3d 1226 (3d Cir. 1995); *Muhammad v. McMickens*, 86 Civ. 7376, 1988 U.S. Dist. LEXIS 552, *8-9 (S.D.N.Y. Jan. 25, 1988).  Because the grievance procedures

are not constitutionally required, a state's violation of those procedures or its failure to enforce them does not give rise to a claim under section 1983, under the due process clause, or otherwise. *Id.*

Thus, regardless of plaintiff's complaints about the grievance procedure or how his claims were investigated, his claims regarding those procedures must be dismissed.

**9.    Right to Privacy**

In his amended complaint, plaintiff names Diane Kastia, the Mail Room Supervisor.  Plaintiff states that after he fainted in the housing unit and was hospitalized for four days, he requested that his medical records be sent to him. AC ¶ 31.  Plaintiff states that the medical records arrived at the facility by regular mail, and that defendant Kastia[11] opened the envelope before she sent the records to plaintiff.  Plaintiff states that after he filed a grievance, the next time that medical records were sent to plaintiff, they were sent to the Clinic. *Id.*  Plaintiff claims that this shows that defendant Kastia became involved in a "conspiracy" against plaintiff, and her actions in sending the records to the Clinic were "in retaliation" for plaintiff filing the grievance. *Id.*

The Due Process Clause of the Fourteenth Amendment[12] protects inmate from the unwanted disclosure of health-related information. *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994), *cited in Verley v. Goord*, 2004 U.S. Dist. LEXIS 857, *60 (S.D.N.Y. Jan. 22, 2004).  Prison officials may impinge upon that right only to the extent that their actions are "reasonably related to legitimate penological interests." *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999).  Inmates also have a

---

[11] It is actually unclear who plaintiff claims opened the envelope because although plaintiff states in one sentence that the envelope was opened by Kastia, the next sentence states that "[p]laintiff tried to find out the name of this person but was blocked at every turn." AC ¶ 31. Defendant Kastia is the "supervisor," and would have had to have been "personally involved" in order for plaintiff to bring this action against her.  For purposes of this decision, the court will assume that defendant Kastia opened the envelope.

[12] Plaintiff cites the Fourth Amendment, however, it is under the Fourteenth Amendment that an inmates right to privacy is protected. *Doe, supra.*  The court will interpret the pro se plaintiff's papers to raise the strongest arguments they suggest. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).  The court will assume that plaintiff in this case has cited the appropriate basis for his claim.

constitutional right to send an receive mail, which may be infringed where the infringement is

"reasonably related to a legitimate penological interest." *Rodriguez v. Ames*, 224 F. Supp. 2d 555, 564

(W.D.N.Y. 2002)(citing *inter alia Turner v. Safely*, 482 U.S. 78, 89 (1987)).

With respect to the "disclosure" of medical information, the court notes that an inmate's

privacy right varies with the inmate's condition, with a greater interest in the disclosure of highly

sensitive conditions. *Webb v. Goldstein*, 117 F. Supp. 2d 289, 298 (E.D.N.Y. 2000).  In *Rodriguez v.*

*Ames*, the court also held that where the information is spread through "humor or gossip," it is more

likely that the inmate's right to privacy will have been violated. 287 F. Supp. 2d at 220 (citing *Powell*,

175 F.3d at 112).

In this case, plaintiff simply claims that someone in the mail room opened an envelope that

contained plaintiff's medical records from his four-day hospitalization after he fainted in the housing

unit.  Plaintiff states that there was a positive "tilt-table" test, showing that plaintiff became

unconscious after four minutes and thirteen seconds on the tilt-table, but that no reason for his

fainting was determined. AC ¶ 31.  This information is not of the sensitive nature[13] discussed in

*Powell* or *Doe*.  Additionally, the information in this case was not "disseminated" or made public to

other inmates.  Plaintiff alleges that an envelope containing the medical records was opened and sent

to plaintiff.  Technically, there was a disclosure of the information, but the information was not of a

highly sensitive nature, and the person who saw the information was entrusted to open all inmates

incoming correspondence.

Plaintiff claims that defendant Kastia's decision to send plaintiff's medical records to the

Clinic the second time shows that she was retaliating against plaintiff for complaining about her

---

[13] *Powell* involved transsexualism, and *Doe* involved HIV status. *Powell*, 175 F.3d at
109; *Doe*, 15 F.3d at 265.

previous conduct.  However, assuming the truth of these facts, defendant Kastia's actions were

perfectly logical and were taken in an attempt to protect plaintiff's privacy.  Sending medical records

to the Clinic where plaintiff would be treated is not a violation of plaintiff's privacy rights.  Plaintiff

cannot seriously claim that sending medical records to the Clinic was retaliation for filing a

grievance.

Any action taken by defendants in retaliation for the exercise of a constitutional right, even if

not unconstitutional in itself, states a viable constitutional claim. *Franco v. Kelly*, 854 F.2d 584,

588-90 (2d Cir. 1988).  In order to establish a claim of retaliation for the exercise of a constitutional

right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that

the conduct was a substantial motivating factor for adverse action taken against him by defendants.

*Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)(citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir.

2002); *Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)).  The court must keep in mind that

claims of retaliation are "easily fabricated" and thus, plaintiffs must set forth non-conclusory

allegations. *Id.* (citing *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other

grounds, Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)).

It has been held that "[o]nly retaliatory conduct that would deter a similarly situated individual

of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a

claim of retaliation." *Odom v. Dixion*, 04-CV-889, 2008 U.S. Dist. LEXIS 11748, *62-63 (W.D.N.Y.

Feb. 15, 2008)(quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)).  In *Dawes v. Walker*, 239

F.3d 489, 492-93 (2d Cir. 2001), the Second Circuit recognized that there are situations in which *de

minimis retaliation* is "outside the ambit of constitutional protection." *Id.* (citing *Davidson v.

Chestnut*, 193 F.3d 144, 150 (2d Cir. 1999)).

In this case, there is no adverse action.  Even if defendant Kastia sent plaintiff's medical

records to the Clinic, it is unclear how this action is adverse to plaintiff or how this action would deter plaintiff from asserting his rights.  Thus, the complaint may be dismissed as against defendant Kastia.

**10.     Due Process and Equal Protection**

Plaintiff's Eleventh Cause of Action contains a claim for "due process" and "equal protection" violations in conjunction with plaintiff's attempt to obtain medical assistance.  The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly situated people alike. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995)(citation omitted).  Generally, the equal protection clause has been "concerned with governmental 'classifications that affect some groups of citizens differently than others.'" *Engquist v. Or. Dep't of Agric.*, 128 S. Ct. 2146, 2152 (2008).  However, an equal protection claim can sometimes be sustained even if the plaintiff does not allege "class-based" discrimination and instead claims that he has been irrationally singled out as a "class of one." *Id.* (internal quotations omitted).

To establish an equal protection violation, the plaintiff must show that the defendants applied a different standard to similarly situated individuals. *Wiggins v. N.Y. City Dep't of Corr.*, 06 Civ. 1946, 2008 U.S. Dist. LEXIS 61262, *21 (S.D.N.Y. Aug. 12, 2008)(citing *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 111 (2d Cir. 2006)).  Plaintiff must first show that he was treated differently than others similarly situated because of intentional or purposeful discrimination. *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005).  Then, plaintiff must show that the difference in treatment cannot survive the appropriate level of scrutiny. *Id.*  In a "class-of-one" claim, the Equal Protection clause requires a "rational basis for the difference in treatment." *Id.* (citing *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

In this case, plaintiff does not explain how he was denied either "due process" or "equal protection" by any of the defendants.  His Eighth Amendment claim has been discussed above, thus,

there is no "substantive due process" claim, and plaintiff does not state how he was treated differently that any other inmate that was similarly situated to him.  Thus, plaintiff's equal protection and due process claims may be dismissed.

**11.**   **Criminal Statutes**

Plaintiff alleges that defendants conspired under 18 U.S.C. §§ 241 and 242 to violate his civil rights.  As stated above, plaintiff has not stated a civil rights violation.  In any event, these statutes are criminal in nature, and there is no private right of action to enforce them. *Williams v. Jurow*, 05 Civ. 6949, 2007 U.S. Dist. LEXIS 97494, *24-25 (S.D.N.Y. June 29, 2007)(citations omitted). Additionally, plaintiff's conclusory allegations of conspiracy fail under the civil rights statutes as well.

**12.**   **Supplemental Jurisdiction**

Plaintiff has alleged various state law causes of action.  This court has already determined that plaintiff states no constitutional claims, and the court has dismissed all claims over which it had original jurisdiction.  Any state law claims against the defendants are barred by section 24 of the New York State Corrections Law. *Murphy v. West*, 533 F. Supp. 2d 312, 317 (W.D.N.Y. 2008) (citing *inter alia Baker v. Coughlin*, 77 F.3d 12, 14-15 (2d Cir. 1996); N.Y. CORRECT. LAW § 24.  In any event, when all the federal claims are dismissed prior to trial, the court should decline to exercise supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(c)(3). *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726-27 (1966).  Thus, this court will dismiss all of plaintiff's supplemental state law causes of action.

**WHEREFORE**, based on the findings above, it is

**ORDERED,** that plaintiff's motion for sanctions (Dkt. No. 53) is **DENIED**, and it is

**ORDERED**, that plaintiff's motion to strike (Dkt. No. 61) is **DENIED**, and it is

    **ORDERED**, that defendants' motions for judgment on the pleadings (Dkt. Nos. 52 and 76) be

**GRANTED** and the amended complaint **DISMISSED IN ITS ENTIRETY WITHOUT**

**PREJUDICE**.

Dated:March 3, 2009


Thomas J. McAvoy
Senior, U.S. District Judge